**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

RYAN KARNOSKI; CATHRINE
SCHMID, Staff Sergeant; D. L.,
FKA K. G., by his next friend
and mother, LAURA GARZA;
HUMAN RIGHTS CAMPAIGN
FUND; GENDER JUSTICE LEAGUE;
LINDSEY MULLER, Chief Warrant
Officer; TERECE LEWIS, Petty
Officer First Class; PHILLIP
STEPHENS, Petty Officer Second
Class; MEGAN WINTERS, Petty
Officer Second Class; JANE DOE;
AMERICAN MILITARY PARTNER
ASSOCIATION,
            *Plaintiffs-Appellees*,

STATE OF WASHINGTON,
Attorney General's Office  Civil
Rights Unit,
        *Intervenor-Plaintiff-Appellee*,

                    v.

DONALD J. TRUMP, in his official
capacity as President of the
United States; UNITED STATES
OF AMERICA; PATRICK M.
SHANAHAN, in his official
capacity as Acting Secretary of

No. 18-35347

D.C. No.
2:17-cv-01297-MJP

2                     KARNOSKI V. TRUMP

Defense; UNITED STATES
DEPARTMENT OF DEFENSE,
                    *Defendants-Appellants*.

Appeal from the United States District Court
for the Western District of Washington
Marsha J. Pechman, District Judge, Presiding

| | |
|---|---|
| IN RE DONALD J. TRUMP, in his official capacity as President of the United States; UNITED STATES OF AMERICA; PATRICK M. SHANAHAN, in his official capacity as Acting Secretary of Defense; UNITED STATES DEPARTMENT OF DEFENSE; U.S. DEPARTMENT OF HOMELAND SECURITY; KEVIN K. MCALEENAN, Acting Secretary of Homeland Security, | No. 18-72159  D.C. No. 2:17-cv-01297-MJP  OPINION |

DONALD J. TRUMP, in his official
capacity as President of the
United States; UNITED STATES
OF AMERICA; PATRICK M.
SHANAHAN, in his official
capacity as Acting Secretary of
Defense; UNITED STATES
DEPARTMENT OF DEFENSE; U.S.
DEPARTMENT OF HOMELAND
SECURITY; KEVIN K.

MCALEENAN, Acting Secretary
of Homeland Security,
                                    *Petitioners*,

            v.

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF
WASHINGTON, SEATTLE,
                                    *Respondent*,

RYAN KARNOSKI; CATHRINE
SCHMID; D.L.; LAURA GARZA;
HUMAN RIGHTS CAMPAIGN;
GENDER JUSTICE LEAGUE;
LINDSEY MULLER; TERECE
LEWIS; PHILLIP STEPHENS;
MEGAN WINTERS; JANE DOE;
AMERICAN MILITARY PARTNER
ASSOCIATION; STATE OF
WASHINGTON,
                *Real Parties in Interest*.

Petition for Writ of Mandamus

Argued and Submitted October 10, 2018
Portland, Oregon

Filed June 14, 2019

4                         KARNOSKI V. TRUMP

Before:  Raymond C. Fisher, Richard R. Clifton,
and Consuelo M. Callahan, Circuit Judges.

Per Curiam Opinion

## SUMMARY[*]

### Civil Rights

In an action challenging a 2017 Presidential Memorandum which barred transgender individuals from serving in the military, the panel: (1) vacated the district court's order striking the defendants' motion to dissolve a 2017 preliminary injunction that had stayed enforcement, and remanded to the district court to reconsider the motion; (2) stayed the 2017 preliminary injunction through the district court's further consideration of defendants' motion to dissolve the injunction; and (3) issued a writ of mandamus vacating the district court's discovery order and directing the district court to reconsider discovery by giving careful consideration to executive branch privileges.

In July 2017, President Trump announced on Twitter that transgender individuals would not be allowed to serve in the military.   This was followed by an August 2017 Memorandum implementing his announcement.  Plaintiffs brought suit alleging that the Twitter Announcement and 2017 Memorandum unconstitutionally discriminated against transgender individuals.    The district court issued a

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

preliminary injunction against enforcement of the 2017 Memorandum, essentially holding that it was not a considered military judgment that warranted deference. In March 2018, the President revoked the 2017 Memorandum and authorized then-Secretary of Defense James Mattis to implement a policy, based on a 44-page report, which addressed a medical condition, gender dysphoria, rather than transgender status. Defendants then asked the district court to dissolve the 2017 preliminary injunction on the basis that the 2018 Policy was a new policy to be evaluated on its own merit. The district court struck the motion to dissolve.

In vacating the district court's order striking defendants' motion to dissolve the 2017 preliminary injunction, the panel held that the 2018 Policy was significantly different from the 2017 Memorandum in both its creation and its specific provisions and therefore defendant had made the requisite threshold showing of a significant change of facts. The panel therefore remanded for the district court to address whether the change warranted dissolution of the 2017 preliminary injunction.

In determining what level of scrutiny the district court should apply on remand, the panel concluded that the 2018 Policy on its face treated transgender persons differently than other persons, and consequently something more than rational basis but less than strict scrutiny applied to the military's decisionmaking. The panel further concluded that on the current record, a presumption of deference was owed to the decisionmaking because the 2018 Policy appeared to have been the product of independent military judgment, and therefore the district court could not substitute its own evaluation of evidence for a reasonable evaluation by the military. The panel further stayed the 2017 preliminary

injunction consistent with the Supreme Court's order of January 22, 2019, which had stayed the preliminary injunction pending appeal in the Ninth Circuit. The panel stated that should the district court deny the motion to dissolve the injunction, the stay would remain in place throughout this Court's disposition of any appeal by the Government.

The panel issued a writ of mandamus vacating the district court's discovery order which had granted plaintiffs' motion to compel discovery of government documents. The panel held that the executive privileges—the presidential communications privilege and deliberative process privilege—although not absolute, required careful consideration by the judiciary, even when they have not been clearly or persuasively raised by the government. The panel held that in its further considerations of plaintiffs' discovery requests, the district court should give careful consideration to executive branch privileges as set forth in *Cheney v. U.S. District Court for the District of Columbia*, 542 U.S. 367 (2004), and *FTC v. Warner Communications Inc.*, 742 F.2d 1156 (9th Cir. 1984).

## COUNSEL

*Appeal No. 18-35347*

Brinton Lucas (argued), Counsel to the Assistant Attorney General; Tara S. Morrissey and Marleigh D. Dover, Appellate Staff; Hashim M. Mooppan, Deputy Assistant Attorney General; Civil Division, United States Department of Justice, Washington, D.C.; for Defendants-Appellants.

Stephen R. Patton (argued), Daniel Siegfried, Vanessa Barsanti, Scott Lerner, and James F. Hurst, Kirkland & Ellis LLP, Chicago, Illinois; Peter C. Renn, Lambda Legal Defense and Education Fund Inc., Los Angeles, California; Tara L. Borelli, Lambda Legal Defense and Education Fund Inc., Atlanta, Georgia; Kara Ingelhart and Camilla B. Taylor, Lambda Legal Defense and Education Fund Inc., Chicago, Illinois; Sasha Buchert and Diana Flynn, Lambda Legal Defense and Education Fund Inc., Washington, D.C.; Carl Charles, Lambda Legal Defense and Education Fund Inc., New York, New York; Peter E. Perkowski, OutServe-SLDN Inc., Los Angeles, California; Jason B. Sykes and Derek A. Newman, Newman Du Wors LLP, Seattle, Washington; for Plaintiffs-Appellees.

La Rond Baker (argued) and Colleen Melody, Assistant Attorneys General; Alan Copsey, Deputy Solicitor General; Robert W. Ferguson, Attorney General; Office of the Attorney General, Seattle, Washington; for Intervenor-Plaintiff-Appellee.

Maura Healey, Attorney General; Sara A. Colb, Kimberly A. Parr, and Genevieve C. Nadeau, Assistant Attorneys General; Office of Attorney General, Boston, Massachusetts; Xavier Becerra, Attorney General of California, Sacramento, California; George Jepsen, Attorney General of Connecticut, Hartford, Connecticut; Matthew P. Denn, Attorney General of Delaware, Wilmington, Delaware; Karl A. Racine, Attorney General of the District of Columbia, Washington, D.C.; Russell A. Suzuki, Attorney General of Hawaii, Honolulu, Hawaii; Lisa Madigan, Attorney General of Illinois, Chicago, Illinois; Tom Miller, Attorney General of Iowa, Des Moines, Iowa; Janet T. Mills, Attorney General of Maine, Augusta, Maine; Brian E. Frosh, Attorney General of

Maryland; Baltimore, Maryland; Gurbir S. Grewal, Attorney General of New Jersey, Trenton, New Jersey; Hector Balderas, Attorney General of New Mexico, Santa Fe, New Mexico; Barbara D. Underwood, Attorney General of New York, New York, New York; Joshua H. Stein, Attorney General of North Carolina, Raleigh, North Carolina; Ellen F. Rosenblum, Attorney General of Oregon, Salem, Oregon; Josh Shapiro, Attorney General of Pennsylvania, Harrisburg, Pennsylvania; Peter F. Kilmartin, Attorney General of Rhode Island, Providence, Rhode Island; Mark R. Herring, Attorney General of Virginia, Richmond, Virginia; Thomas J. Donovan, Jr., Attorney General of Vermont, Montpelier, Vermont, for Amici Curiae Massachusetts, California, Connecticut, Delaware, Hawaii, Illinois, Iowa, Maine, Maryland, New Jersey, New Mexico, New York, North Carolina, Oregon, Pennsylvania, Rhode Island, Virginia, Vermont, and the District of Columbia.

Douglas C. Dreier and Stuart F. Delery, Gibson Dunn & Crutcher LLP, Washington, D.C., for Amicus Curiae The Trevor Project.

Sherrilyn A. Ifill, Director-Counsel, Janai S. Nelson, and Samuel Spital, NAACP Legal Defense & Educational Fund, Inc., New York, New York; Daniel S. Harawa, NAACP Legal Defense & Educational Fund Inc., Washington, D.C.; for Amicus Curiae NAACP Legal Defense & Educational Fund Inc.

Devi M. Rao and Scott B. Wilkens, Jenner & Block LLP, Washington, D.C.; Benjamin J. Brysacz, Jenner & Block LLP, Los Angeles, California; for Amici Curiae American Medical Association, American College of Physicians, and Nine Other Health Care Organizations.

William B. Stafford and Abha Khanna, Perkins Coie LLP, Seattle, Washington; Ashwin P. Phatak, David H. Gans, Brianne J. Gorod, and Elizabeth B. Wydra, Constitutional Accountability Center, Washington, D.C.; for Amicus Curiae Constitutional Accountability Center.

Matthew S. Blumenthal and Harold Hongju Koh, Rule of Law Clinic, Yale Law School, New Haven, Connecticut; Jake Ewart, Hillis Clark Martin & Peterson P.S., Seattle, Washington; Phillip Spector, Messing & Spector LLP, Baltimore, Maryland; for Amici Curiae Retired Military Officers and Former National Security Officials.

Suzanne B. Goldberg, Sexuality and Gender Law Clinic, Columbia Law School, New York, New York; William C. Miller, Robert C. K. Boyd, and Cynthia Cook Robertson, Pillsbury Winthrop Shaw Pittman LLP, Washington, D.C., for Amici Curiae The Service Women's Action Network, California Women Lawyers, Center for Reproductive Rights, Columbia Law School Sexuality and Gender Law Clinic, Connecticut Women's Education and Legal Fund, Equal Rights Advocates, Legal Voice, Michigan Association for Justice, National Women's Law Center, and the Women's Bar Association of the District of Columbia.

John C. Quinn, Julie E. Fink, Roberta A. Kaplan, and Joshua Matz, Kaplan Hecker & Fink LLP, New York, New York, for Amici Curiae National Center for Transgender Equality, Southern Arizona Gender Alliance, The Trans Youth Equality Foundation, Transcend Legal, Transgender Allies Group, Transgender Legal Defense & Education Fund, and Transgender Resource Center of New Mexico.

Susan Baker Manning, Morgan Lewis & Bockius LLP, Washington, D.C.; Corey Houmand, Morgan Lewis & Bockius LLP, Palo Alto, California; for Amici Curiae Vice Admiral Donald C. Arthur, USN (Ret.), former Surgeon General of the U.S. Navy; Major General Gale Pollock, USA (Ret.), former Acting Surgeon General of the U.S. Army, and Rear Admiral Alan M. Steinman, USPHS/USCG (Ret.), Former Director of Health and Safety of the U.S. Coast Guard.

*Appeal No. 18-72159*

Mark R. Freeman (argued), Brad Hinshelwood, Tara S. Morrissey, Marleigh D. Dover, and Mark B. Stern, Appellate Staff; Brinton Lucas, Counsel to the Assistant Attorney General; Hashim M. Mooppan, Deputy Assistant Attorney General; Joseph H. Hunt, Assistant Attorney General; Civil Division, United States Department of Justice, Washington, D.C.; for Petitioners.

Stephen R. Patton (argued), Daniel Siegfried, Vanessa Barsanti, Scott Lerner, Jordan M. Heinz, and James F. Hurst, Kirkland & Ellis LLP, Chicago, Illinois; Peter C. Renn, Lambda Legal Defense and Education Fund Inc., Los Angeles, California; Tara L. Borelli, Lambda Legal Defense and Education Fund Inc., Atlanta, Georgia; Sasha Buchert and Diana Flynn, Lambda Legal Defense and Education Fund Inc., Washington, D.C.; Kara Ingelhart and Camilla B. Taylor, Lambda Legal Defense and Education Fund Inc., Chicago, Illinois; Paul D. Castillo, Lambda Legal Defense and Education Fund Inc., Dallas, Texas; Peter E. Perkowski, OutServe-SLDN Inc., Los Angeles, California; Jason B. Sykes and Derek A. Newman, Newman Du Wors LLP, Seattle, Washington; for Real Parties in Interest.

## OPINION

PER CURIAM:

In July 2017, President Trump announced on Twitter that transgender individuals would not be allowed to serve in the military. This was followed by an August 2017 Memorandum implementing his announcement. Plaintiffs, transgender individuals who serve in the military or seek to do so, subsequently joined by the State of Washington, brought this lawsuit alleging that the 2017 Memorandum unconstitutionally discriminated against transgender individuals. The district court issued a preliminary injunction against enforcement of the 2017 Memorandum, essentially holding that it was not a considered military judgment that warranted deference. Defendants, the President and certain federal agencies and officials, appealed the preliminary injunction but then voluntarily withdrew their appeal.

In the meantime, a panel appointed by then-Secretary of Defense James Mattis studied the issue of transgender individuals serving in the military. After the panel completed its work, the Defense Department produced a 44-page report. Based on this report, Secretary Mattis recommended to the President that he revoke the 2017 Memorandum so that he could adopt the report's recommendation. The President followed the recommendation and on March 23, 2018, revoked his 2017 Memorandum and authorized Secretary Mattis to implement the policies he proposed based on the 44-page report (these are sometimes referred to collectively as the "2018 Policy").

Defendants then requested that the district court dissolve its preliminary injunction on the basis that the 2018 Policy

was a new policy that had to be evaluated on its own merit. Defendants asserted that the 2018 Policy addressed a medical condition, gender dysphoria, rather than transgender status. The district court struck the motion to dissolve the injunction. Defendants filed this appeal from that order.

Proceedings continued in the district court. On April 19, 2018, the district court struck Defendants' motion for a protective order precluding discovery pending the resolution of Defendants' appeal. On July 27, 2018, the district court issued an order denying Defendants' motion for a protective order of discovery directed at President Trump and granting Plaintiffs' motion to compel the production of documents withheld solely under the deliberative process privilege within ten days. Defendants filed a petition for writ of mandamus with this Court challenging the discovery order. Subsequent orders have stayed further discovery until after we decide the petition.

We vacate the district court's order striking the Defendants' motion to dissolve the preliminary injunction and we remand to the district court to reconsider the motion. In light of the Supreme Court's January 22, 2019 stay of the district court's preliminary injunction, we stay the preliminary injunction through the district court's further consideration of Defendants' motion to dissolve the injunction. In addition, we issue a writ vacating the district court's discovery order and directing the district court to reconsider discovery by giving careful consideration to executive branch privileges as set forth in *Cheney v. U.S. District Court for the District of Columbia*, 542 U.S. 367 (2004), and *FTC v. Warner Communications Inc.*, 742 F.2d 1156 (9th Cir. 1984).

# I

## A. Background

Historically, transgender individuals could not serve openly in the military.[1]  In August 2014, the Department of Defense ("DoD") eliminated its categorical ban on retention of transgender service members, enabling each branch of the military to reassess its own policies.  In 2015, then-Secretary of Defense Ashton Carter created a working group to study the policy and readiness implications of allowing transgender individuals to serve in the military.  Secretary Carter instructed the working group to "start with the presumption that transgender persons can serve openly without adverse impact on military effectiveness and readiness, unless and except where objective, practical impediments are identified." As part of this review, the RAND National Defense Research

---

[1] Although most people have a gender identity that matches their sex assigned at birth, this is not the case for transgender people, who identify as transgender because their gender identity does not match their birth-assigned sex.  In some instances, the discordance between one's gender identity and birth-assigned sex can be associated with clinically significant distress, known as gender dysphoria.  Living in a manner consistent with one's gender identity is a key aspect of treatment for gender dysphoria. *See* Br. Amicus Curiae Am. Med. Ass'n et al. at 10–11.  The process whereby transgender individuals come to live in a manner consistent with their gender identity, rather than their birth-assigned sex, is known as transition.  Transition is "[t]he process that people go through as they change their gender expression and/or physical appearance (e.g., through hormones and/or surgery) to align with their gender identity.  A transition may occur over a period of time, and may involve coming out to family, friends, co-workers, and others; changing one's name and/or sex designation on legal documents (e.g., drivers' licenses, birth certificates); and/or medical intervention."  Glossary of Gender and Transgender Terms, Fenway Health 4 (Jan. 2010 Revision).

Institute was commissioned to conduct a study and issue a report of its findings (the "RAND Report").[2]  The RAND Report concluded that health care for transgender service members would be a "very small part of the total health care" provided to service members and estimated the impact on the military's readiness from accepting transgender individuals would be "negligible."

Following the issuance of the RAND Report, Secretary Carter in June 2016 ordered the armed forces to adopt a new policy on military service by transgender individuals (the "Carter Policy").  The policy provided that "transgender individuals shall be allowed to serve [openly] in the military . . . while being subject to the same standards and procedures as other members with regard to their medical fitness for duty, physical fitness, uniform and grooming, deployability, and retention."

On June 30, 2017, Secretary Mattis deferred accessing transgender applicants into the military until January 1, 2018.[3]  The announcement stated that the armed forces "will review their accession plans and provide input on the impact to the readiness and lethality of our forces."

---

[2] RAND was "to conduct a study to (1) identify the health care needs of the transgender population, transgender service members' potential health care utilization rates, and the costs associated with extending health care coverage for transition-related treatments; (2) assess the potential readiness implications of allowing transgender service members to serve openly; and (3) review the experiences of foreign militaries that permit transgender service members to serve openly."

[3] Broadly speaking, "accession" refers to enlisting in the military.

### 1. The July 26, 2017 Twitter Announcement

On July 26, 2017, President Trump announced over Twitter that the United States would no longer accept or allow transgender people to serve in the military:

> After consultation with my Generals and military experts, please be advised that the United States Government will not accept or allow Transgender individuals to serve in any capacity in the U.S. Military. Our military must be focused on decisive and overwhelming victory and cannot be burdened with the tremendous medical costs and disruption that transgender in the military would entail. Thank you.

This is sometimes referred to as the "Twitter Announcement."

### 2. The August 25, 2017 Presidential Memorandum

The Twitter Announcement was followed on August 25, 2017, by a Presidential Memorandum (the "2017 Memorandum," and collectively with the Twitter Announcement, sometimes referred to as "the Ban"). The 2017 Memorandum noted that until June 2016, the DoD and the Department of Homeland Security ("DHS") "generally prohibited openly transgender individuals from accession into the United States military and authorized the discharge of such individuals." The 2017 Memorandum noted that Secretary Carter had revised those policies in 2016, but it expressed the view that Secretary Carter had "failed to identify a sufficient basis to conclude that terminating the

Departments' longstanding policy and practice would not hinder military effectiveness and lethality, disrupt unit cohesion, or tax military resources."

The 2017 Memorandum "direct[ed] the Secretary of Defense, and the Secretary of Homeland Security with respect to the U.S. Coast Guard, to return to the longstanding policy and practice on military service by transgender individuals that was in place prior to June 2016 until such time as a sufficient basis exists upon which to conclude that terminating that policy and practice would not . . . . hinder military effectiveness and lethality, disrupt unit cohesion, or tax military resources."

Specifically, the 2017 Memorandum directed the Departments to "maintain the [pre-2016] policy regarding accession of transgender individuals into military service," and to "halt all use of DoD or DHS resources to fund sex-reassignment surgical procedures for military personnel."[4] It directed the Secretary of Defense, in consultation with the Secretary of Homeland Security, to submit "a plan for implementing" the general policy and the specific directives of the 2017 Memorandum by February 21, 2018. It provided that, "[a]s part of the implementation plan, the Secretary of Defense, in consultation with the Secretary of Homeland Security, shall determine how to address

---

[4] The district court stated that the 2017 Memorandum authorized:

> the discharge of openly transgender service members (the "Retention Directive"); prohibited the accession of openly transgender service members (the "Accession Directive"); and prohibited the use of [DoD] and [DHS] resources to fund "sex reassignment" surgical procedures (the "Medical Care Directive").

transgender individuals currently serving in the United States military," but stated that, "[u]ntil the Secretary has made that determination, no action may be taken against such individuals under the policy [mandating a return to the pre-2016 policy]."[5]

### 3.  The Complaint

Following the Twitter Announcement and the 2017 Memorandum, a complaint was filed in the District Court for the Western District of Washington.  Shortly thereafter, Plaintiffs filed an amended complaint, which is the most recent statement of Plaintiffs' claims.  The amended complaint alleges that the policy adopted through the Twitter Announcement and the 2017 Memorandum discriminates against transgender people regarding military service in violation of the equal protection and substantive due process guarantees of the Fifth Amendment and the free speech guarantee of the First Amendment of the U.S. Constitution.

Plaintiffs included nine individuals, three organizations, and, as intervenor, the State of Washington.  Plaintiff Ryan Karnoski, for example, is a transgender man who holds a master's degree in social work, works as a mental health technician, comes from a family with a history of military service, and aspires to serve as an officer in the military.  His desire to join the military came into sharper focus following the death of his cousin, who was killed in action in Afghanistan in 2009.  He would like to join the military but

---

[5] The 2017 Memorandum also provided that "[t]he Secretary of Defense, after consulting with the Secretary of Homeland Security, may advise me at any time, in writing, that a change to this policy is warranted."

is prohibited from doing so because of his transgender status. Plaintiff Staff Sergeant Cathrine Schmid is a transgender woman who was diagnosed with gender dysphoria in 2013. She joined the Army in 2005, has received numerous awards and decorations for her service, and currently serves as a Signals Intelligence Analyst. She serves openly as a woman, and she is recognized and treated as female in all aspects of military life. In June 2017, Staff Sergeant Schmid submitted an application to become an Army warrant officer, but her application was placed on hold in light of her transgender status.

### 4. Secretary Mattis' September 2017 Interim Guidance

On September 14, 2017, Secretary Mattis acknowledged receipt of the 2017 Memorandum and promised to "present the President with a plan to implement the policy and directives in the Presidential Memorandum" no later than February 21, 2018. Secretary Mattis also issued "Interim Guidance" to take effect immediately and remain in effect pending promulgation of a final policy. The Interim Guidance provided that the pre-2016 policies prohibiting the accession of transgender individuals into the military would remain in effect and that no new sex reassignment surgical procedures for military personnel would be permitted after March 22, 2018. It further provided that "no action may be taken to involuntarily separate or discharge an otherwise qualified Service member solely on the basis of a gender dysphoria diagnosis or transgender status" during the interim period.

### 5. Secretary Mattis' Creation of a Panel to Develop the Implementation Plan

On the same day that Secretary Mattis issued the Interim Guidance, he directed "the Deputy Secretary of Defense and the Vice Chairman of the Joint Chiefs of Staff to lead the [DoD] in developing an Implementation Plan on military service by transgender individuals, to effect the policy and directives in [the] Presidential Memorandum." The Implementation Plan was to "establish the policy, standards and procedures for service by transgender individuals in the military, consistent with military readiness, lethality, deployability, budgetary constraints, and applicable law." The Deputy Secretary of Defense and Vice Chairman of the Joint Chiefs of Staff were to be supported by "a panel of experts drawn from [the] DoD and [DHS]," consisting of "senior uniformed and civilian Defense Department and U.S. Coast Guard leaders" and "combat veterans." Secretary Mattis directed this panel to "bring a comprehensive, holistic, and objective approach to study military service by transgender individuals, focusing on military readiness, lethality, and unit cohesion, with due regard for budgetary constraints and consistent with applicable law."

### 6. The December 11, 2017 Preliminary Injunction

On December 11, 2017, the district court issued a nationwide preliminary injunction enjoining Defendants from "taking any action relative to transgender people that is inconsistent with the status quo that existed prior to President

Trump's July 26, 2017 announcement."[6] Defendants filed an appeal from the preliminary injunction, but subsequently moved to voluntarily dismiss their appeal.[7]

### 7. The February 2018 Defense Department Report

The panel created by Secretary Mattis met 13 times over a period of 90 days. Secretary Mattis reported that the panel:

> met with and received input from transgender
> Service members, commanders of transgender
> Service members, military medical
> professionals, and civilian medical

---

[6] Three other district courts also issued preliminary injunctions against the Ban. *Doe 1 v. Trump*, 275 F. Supp. 3d 167, 177 (D.D.C. 2017) (on October 30, 2017, preliminarily enjoining enforcement of the Accession and Retention Directives); *Stone v. Trump*, 280 F. Supp. 3d 747, 769 (D. Md. 2017) (on November 21, 2017, enjoining "the enforcement of the Retention, Accession, and Sex Reassignment Surgical Directives pending the final resolution of this lawsuit"); *Stockman v. Trump*, No. EDCV 17-1799, 2017 WL 9732572, at *16 (C.D. Cal. Dec. 22, 2017) (on December 22, 2017, enjoining the Accession, Retention, and Sex Reassignment Surgery Directives until the litigation is resolved).

The preliminary injunction in *Doe 1* was vacated on January 4, 2019. *Doe 2 v. Shanahan*, 755 F.App'x 19 (D.C. Cir. 2019). On January 22, 2019, the Supreme Court stayed the preliminary injunctions issued in this case and in *Stockman*. *Trump v. Karnoski*, 139 S. Ct. 950 (2019); *Trump v. Stockman*, 139 S. Ct. 950 (2019).

[7] Defendants' appeal was docketed on December 15, 2017, along with an emergency motion for a stay pending appeal. On December 29, Defendants notified the Ninth Circuit that they were withdrawing the motion for stay pending appeal and voluntarily dismissing the appeal from the preliminary injunction. On December 30, we granted the motion for voluntary dismissal.

professionals with experience in the care and treatment of individuals with gender dysphoria. The [p]anel also reviewed available information on gender dysphoria, the treatment of gender dysphoria, and the effects of currently serving individuals with gender dysphoria on military effectiveness, unit cohesion, and resources. Unlike previous reviews on military service by transgender individuals, the [p]anel's analysis was informed by the Department's own data obtained since the [Carter Policy] began to take effect last year.

In February 2018, the Department of Defense produced a 44-page report based on the panel's work ("the 2018 Report").

## 8. Secretary Mattis' February 22, 2018 Memorandum

Secretary Mattis forwarded the 2018 Report to the President accompanied by a memorandum dated February 22, 2018 (the "Mattis Memorandum"). Secretary Mattis, citing the panel's work and his professional judgment, recommended that the President adopt the following policies:

> \* Transgender persons with a history or diagnosis of gender dysphoria are disqualified from military service, except under the following limited circumstances: (1) if they have been stable for 36 consecutive months in their biological sex prior to accession; (2) Service members diagnosed with

gender dysphoria after entering into service may be retained if they do not require a change of gender and remain deployable within applicable retention standards; and (3) currently serving Service members who have been diagnosed with gender dysphoria since the previous administration's policy took effect and prior to the effective date of this new policy, may continue to serve in their preferred gender and receive medically necessary treatment for gender dysphoria.

\* Transgender persons who require or have undergone gender transition are disqualified from military service.

\* Transgender persons without a history or diagnosis of gender dysphoria, who are otherwise qualified for service, may serve, like all other Service members, in their biological sex.

Secretary Mattis further recommended that the President revoke the 2017 Memorandum in order to allow the adoption of these proposed policies.

**9.  The March 23, 2018 Presidential Memorandum**

On March 23, 2018, the President accepted Secretary Mattis's recommendation, revoked the 2017 Memorandum, and authorized the implementation of "any appropriate

policies concerning military service by transgender individuals."

## B.  The District Court's April 13, 2018 Order

In the meantime, cross-motions for summary judgment and partial summary judgment had been filed in the district court.  The 2018 Policy issued days before the motions were to be heard, and the district court immediately requested supplemental briefs from the parties.  In addition, Defendants moved to dissolve the December 11, 2017 preliminary injunction on the ground that the 2017 Memorandum had been supplanted by the 2018 Policy.

On April 13, 2018, the district court granted in part and denied in part the cross-motions for summary judgment.  The district court first determined that the 2018 Policy had not rendered Plaintiffs' challenges moot.  It observed that the burden of demonstrating mootness "is a heavy one," citing *County of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979). The district court found "that the 2018 Memorandum and the Implementation Plan do not substantively rescind or revoke the Ban, but instead threaten the very same violations that caused it and other courts to enjoin the Ban in the first place."[8]

---

[8] The district court rejected Defendants' assertion that Plaintiffs lacked standing because the 2018 Policy had significantly changed the analysis.  Specifically, the district court opined that even if each of the individual plaintiffs serving in the armed forces came within the reliance exception, they would still have standing because "the Ban already has denied them the opportunity to serve in the military on the same terms as others; has deprived them of dignity; and has subjected them to stigmatization."  The district court determined that Washington had standing because the Ban diminished the number of eligible members for

Addressing Plaintiffs' constitutional claims, the district court concluded that transgender individuals constitute a suspect class and "that the Ban must satisfy the most exacting level of scrutiny if it is to survive." The district court identified four relevant factors for determining whether a classification was suspect or quasi-suspect: (1) whether as a historical matter the class was subject to discrimination; (2) whether the class has a defining characteristic that frequently bears a relationship to its ability to perform or its contribution to society; (3) whether the class exhibits obvious immutable or distinguishing characteristics that define it as a discrete group; and (4) whether the class is a minority or is politically powerless.[9] The district court noted that "courts have consistently found that transgender people constitute, at minimum, a quasi-suspect class," but applying these factors, the district court further concluded that transgender people constitute a suspect class.

Turning to the question of deference, the district court started with its previous determination that the Ban was not owed deference because it was not supported by any evidence of considered reason or deliberation. The district court noted, however, that because "the specifics of the Ban have been further defined in the 2018 Memorandum and the Implementation Plan, whether the Court owes deference to

---

the National Guard and threatened "Washington's ability to (1) protect its residents and natural resources in times of emergency and (2) 'assur[e] its residents that it will act' to protect them from 'the political, social and moral damage of discrimination.'"

[9] The district court cited *Bowen v. Gillard*, 483 U.S. 587, 602 (1987), *City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 440–41 (1989), and *Windsor v. United States*, 699 F.3d 169, 181 (2d Cir. 2012), *aff'd on other grounds*, 570 U.S. 744 (2013).

the Ban presents a more complicated question." The district court explained that: (1) any justification for the Ban must be "genuine, not hypothesized or invented *post hoc* in response to litigation" (quoting *United States v. Virginia*, 518 U.S. 515, 533 (1996)); (2) the "complex[,] subtle and professional decisions as to the composition . . . and control of a military force are essentially professional military judgments" (quoting *Gilligan v. Morgan*, 413 U.S. 1, 10 (1973)); and (3) its "entry of a preliminary injunction was not intended to prevent the military from continuing to review the implications of open service by transgender people, nor to preclude it from *ever* modifying the Carter Policy." The district court further noted that Defendants asserted that the 2018 Policy was the product of deliberative review and entitled to deference.

However, the district court declined to grant Defendants relief on the question of deference, noting that: (1) the 2018 Policy, including the 2018 Report, raised unresolved questions of fact; (2) the Implementation Plan was not disclosed until March 29, 2018; and (3) Plaintiffs had not had an opportunity to test or respond to the claims in the 2018 Policy. The district court concluded that on the present record, it "cannot determine whether the DoD's deliberative process—including the timing and thoroughness of its study and the soundness of the medical and other evidence it relied upon—is of the type to which Courts typically should defer." Accordingly, the district court denied "summary judgment as to the level of deference due."

The district court proceeded to hold that, for the same reasons it could not grant summary judgment as to the level of deference, it could not reach the merits of the constitutional violations alleged by Plaintiffs. It therefore

denied their request for summary judgment on their equal protection, due process, and First Amendment claims.

The district court also addressed Defendants' contention that the district court was without jurisdiction to impose injunctive or declaratory relief against the President in his official capacity. The district court granted Defendants' motion for partial summary judgment with regard to injunctive relief and denied it with regard to declaratory relief. It opined that this was an appropriate instance for declaratory relief.[10]

The district court did not rule on the merits of Defendants' motion to dissolve the preliminary injunction, and instead ordered the motion stricken. It stated:

> The preliminary injunction previously entered otherwise remains in full force and effect. Defendants (with the exception of President Trump), their officers, agents, servants, employees, and attorneys, and any other person or entity subject to their control or acting directly or indirectly in concert or participation with Defendants are enjoined

---

[10] The district court cited *Clinton v. City of New York*, 524 U.S. 417, 425 n.9 (1998) (affirming entry of declaratory judgment against President Clinton stating that the Line Item Veto Act was unconstitutional), *Hawaii v. Trump*, 859 F.3d 741, 788 (9th Cir. 2017) (vacating injunctive relief against President Trump, but not dismissing him in suit for declaratory relief), *vacated as moot*, 138 S. Ct. 377 (2017), and *National Treasury Employees Union v. Nixon*, 492 F.2d 587, 609 (D.C. Cir. 1974) (noting that "no immunity established under any case known to this Court bars every suit against the President for injunctive, declaratory or mandamus relief").

> from taking any action relative to transgender
> people that is inconsistent with the status quo
> that existed prior to President Trump's July
> 26, 2017 announcement.

The order directed the parties to proceed with discovery and to prepare for trial. Defendants appeal from the district court's order striking their motion to dissolve the preliminary injunction.[11]

## C. The District Court's July 27, 2018 Discovery Order

In December 2017, Plaintiffs served Defendants with their first set of interrogatories. For example, they requested that Defendants "[i]dentify and describe each of the governmental purposes or interests that you contend will be advanced by the Policy," and "[i]dentify all individuals with whom President Trump has discussed or corresponded with regarding the United States' past, present, or potential future governmental policies on transgender military service or related healthcare, and the dates of each discussion, from November 9, 2016 to the present." Plaintiffs also served Defendants with requests for the production of documents.

---

[11] Defendants filed a motion in the Ninth Circuit to stay the preliminary injunction pending appeal. A three-judge motions panel of the Ninth Circuit denied the motion, noting that "a stay of the preliminary injunction would upend, rather than preserve, the status quo." On January 22, 2019, the Supreme Court granted a stay of the district court's preliminary injunction "pending disposition of the Government's appeal in the United States Court of Appeals for the Ninth Circuit and disposition of the Government's petition for a writ of certiorari, if such writ is sought." *Trump v. Karnoski*, 139 S. Ct. 950 (2019).

Defendants filed objections to the interrogatories and the requests for production.  Among other things, Defendants' objected to the interrogatories to the extent that they sought "communications or information protected by the deliberative process privilege; [and] . . . communications or information protected by the presidential communications privilege." Defendants argued that in *Cheney*, 542 U.S. at 385, the Supreme Court "made clear that discovery directed to the President in civil litigation raises significant separation of powers concerns and should be strictly circumscribed."  In response, Plaintiffs argued that the deliberative process privilege and presidential communications privilege did not bar discovery.

Plaintiffs filed a motion to compel discovery charging that Defendants' initial disclosures were "manifestly inadequate."  After briefing, on March 4, 2018, the district court granted Plaintiffs' motion to compel and found that Defendants' initial disclosures did not provide "any actual information concerning Defendants' claims or defenses."

On March 23, 2018, Defendants filed another motion for a protective order asserting that: (1) the challenge to the 2017 Memorandum was moot because the President had withdrawn the 2017 Memorandum; (2) "[f]urther litigation should be confined to the administrative record provided by the agency"; and (3) "[a] protective order would serve the interests of judicial economy because the Court could avoid addressing constitutional separation-of-powers issues."

On April 19, 2018, the district court denied Defendants' motion for a protective order.  The district court found that, in light of its April 13, 2018 order, *see supra* Section I (B), a protective order was not warranted.  The district court stated

that the case was not moot, discovery related to the Twitter Announcement was not irrelevant, and the 2018 Policy was not a new policy, "but rather a plan to implement, with few exceptions, the directives of the 2017 Memorandum." The district court held that there was no reason for discovery to be confined to the administrative record because Plaintiffs were not challenging the 2018 Policy under the Administrative Procedure Act, but instead raised direct constitutional claims. The district court stated that "Defendants have not demonstrated that precluding discovery will serve the interest of judicial economy in any way." The order concluded:

> To the extent that Defendants intend to claim Executive privilege, they must "expressly make the claim" and provide a privilege log "describ[ing] the nature of the documents, communications, or tangible things not produced or disclosed—and do so in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim." Fed. R. Civ. P. 26(b)(5)(i)–(ii).

In response to Plaintiffs' interrogatories and requests for production, Defendants produced a number of privilege logs, but asserted the deliberative process privilege as the sole basis for withholding or redacting approximately 15,000 documents.

On May 10, 2018, Plaintiffs filed a motion to compel discovery of documents withheld solely under the deliberative process privilege, advancing four arguments. First, they argued that the deliberative process privilege was fashioned to prevent discovery into governmental

deliberations when the governmental decisionmaking process is collateral to a lawsuit, but does not apply where, as here, "plaintiffs challenge the constitutionality of a government decision and allege animus or discriminatory intent," citing *In re Subpoena Duces Tecum Served on the Office of the Comptroller of the Currency*, 145 F.3d 1422, 1424 (D.C. Cir. 1998). Plaintiffs asserted that Defendants' deliberations go to the heart of this lawsuit. Second, Plaintiffs contended that Defendants waived any privilege by putting their deliberative process at issue – i.e., "by asserting that the Ban passes constitutional review because special deference is owed to their military judgment." Third, Plaintiffs argued that even if the privilege applied, their need for discovery prevailed under the applicable balancing test.[12] Fourth, Plaintiffs argued that Defendants withheld materials that fell outside the scope of the privilege. In particular, Plaintiffs asserted that the deliberative process privilege (a) only applies to documents that are "predecisional"—that is "they have been generated prior to an agency's adoption of a policy or decision"; (b) "only applies to documents that are 'deliberative' in that they reflect the give-and-take of a deliberative decision-making process"; and (c) "does not

---

[12] Plaintiffs, citing *FTC v. Warner Communications Inc.*, 742 F.2d 1156, 1161 (9th Cir. 1984), and *North Pacifica, LLC v. City of Pacifica*, 274 F. Supp. 2d 1118, 1122 (N.D. Cal. 2003), listed eight considerations that the court should balance: (1) the relevance of the evidence; (2) the availability of other evidence; (3) the government's role in the litigation; (4) the extent to which disclosure would hinder frank and independent discussion regarding contemplated policies and decisions; (5) the interest of the litigant, and ultimately society, in accurate judicial fact finding; (6) the seriousness of the litigation and the issues involved; (7) the presence of issues concerning alleged governmental misconduct; and (8) the federal interest in the enforcement of federal law.

extend to purely factual information or expert opinion and scientific conclusions regarding facts."

Defendants opposed the motion to compel, arguing that Plaintiffs challenged only the 2017 Memorandum and did not amend their complaint to challenge the 2018 Policy. Specifically, Defendants argued that the deliberative process privilege protects the government's decision-making process by shielding documents "reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 150 (1975) (quoting *Carl Zeiss Stiftung v. V. E. B. Carl Zeiss, Jena*, 40 F.R.D. 318, 324 (D.D.C. 1966)); Defendants asserted that the deliberative process privilege applies to this case and that the Ninth Circuit has applied the balancing test set forth in *Warner*, 742 F.2d 1156. Defendants further contended that events occurring after the 2017 Twitter Announcement remained subject to the deliberative process privilege. They noted that the 2017 Memorandum contemplated further research, further determinations by the Secretary of Defense, and further recommendations to the President.

The parties conferred over the discovery requests, but were unable to resolve their differences. On May 21, 2018, Defendants filed another motion for a protective order, arguing that: (1) discovery served on the President should be precluded on separation-of-powers grounds; (2) discovery related to the President's communications and deliberations must be strictly circumscribed; and (3) the President should not be required to formally invoke his privileges until the court rules that Plaintiffs have met an initial heavy burden. Plaintiffs filed an opposition to the motion for a protective

order contending that Defendants were attempting "to transform the qualified presidential communications privilege into an absolute bar."

On July 27, 2018, the district court granted Plaintiffs' motion to compel and denied Defendants' motion for a protective order.[13]    Addressing the deliberative process privilege, the district court, citing *Warner*, 742 F.2d at 1161, stated that for the privilege to apply, a document must be (1) predecisional, meaning that it was generated before the adoption of an agency's policy or decision, and (2) deliberative, meaning that it contains opinions, recommendations, or advice about agency policies.    The district court noted that the deliberative process privilege is not absolute, and that, applying the standard set forth in *Warner*, the question was whether Plaintiffs' "need for the materials and the need for accurate fact-finding override the government's interest in nondisclosure."    *Id*.    The district court found that the deliberative process privilege should be narrowly construed and that Defendants did not meet their burden of establishing its applicability.

---

[13] Before addressing the merits of the discovery motions, the district court considered the impact of *Trump v. Hawaii*, 138 S. Ct. 2392 (2018). The district court rejected Defendants' claim that the reasoning in that case precluded discovery directed at the President here.  The district court reasoned first that *Hawaii* involved an entirely different standard of scrutiny and unlike "the policy in *Hawaii*, the [district court] need not 'look behind the face' of the Ban, as the Ban is facially discriminatory." Second, the district court noted that the majority in *Hawaii* "repeatedly emphasized that the exclusion policy was formulated following a 'worldwide, multi-agency review'" whereas in this case Defendants "have provided no information whatsoever concerning the process by which the Ban was formulated."  Further, the district court noted that *Hawaii* "does not purport to address the scope of discovery or the application of any privilege."

The district court concluded that the evidence sought was "undoubtedly relevant." The district court held that Defendants could not maintain that deference was owed to the Ban because it was a considered decision, while at the same time withhold all information concerning the alleged deliberations leading to that decision. The district court also found that because Defendants possessed all the evidence concerning their deliberations, the evidence was not otherwise available to Plaintiffs. The district court further held that Defendants could not avoid disclosure based on speculation that discovery would chill future policy decisions; rather, Defendants had to "identify specific, credible risks which cannot be mitigated by the existing protective order in this case" and that outweigh the court's "need to perform the 'searching judicial inquiry' that strict scrutiny requires."

Addressing Defendants' motion for a protective order, the district court recognized that *Cheney*, 542 U.S. at 387, held that discovery directed at the President involves special considerations. But the district court noted that the President was not immune from civil discovery and that courts have permitted discovery directed at the President where "he is a party or has information relevant to the issues in dispute," citing *United States v. Nixon*, 418 U.S. 683, 706 (1974), and *Clinton*, 520 U.S. at 704. The district court indicated that the President could invoke the privilege when asked to produce documents, and that if he does so, the documents are presumed privileged. However, this privilege is not absolute, and if a court finds the privilege is overcome by an adequate showing of need, the court may review the documents *in camera*.

The district court then stated:

> To date, President Trump and his advisors
> have failed to invoke the presidential
> communications privilege, to respond to a
> single discovery request, or to produce a
> privilege log identifying the documents,
> communications, and other materials they
> have withheld. While Defendants claim they
> need not do so until Plaintiffs "exhaust other
> sources of non-privileged discovery, meet a
> heavy, initial burden of establishing a
> heightened, particularized need for the
> specific information or documents sought, and
> at a minimum substantially narrow any
> requests directed at presidential
> deliberations," the Court finds no support for
> this claim. To the extent the President intends
> to invoke the privilege, the Court already
> ordered that he "'expressly make the claim'
> and provide a privilege log 'describ[ing] the
> nature of the documents, communications, or
> tangible things not produced or
> disclosed—and do so in a manner that,
> without revealing information itself privileged
> or protected, will enable other parties to
> assess the claim.'" Only then can the Court
> evaluate whether the privilege applies and if
> so, whether Plaintiffs have established a
> showing of need sufficient to overcome it.

Accordingly, the district court granted the motion to
compel and denied the motion for a protective order.
Paragraph 3 of the order stated:

The Court notes that the government privilege logs it has reviewed to date are deficient and do not comply with Federal Rule of Civil Procedure 26(b)(5)(A)(i)–(ii).  Privilege logs must provide sufficient information to assess the claimed privilege and to this end must (a) identify individual author(s) and recipient(s); and (b) include *specific, non-boilerplate* privilege descriptions *on a document-by-document basis*.  To the extent they have not already done so, the Court ORDERS Defendants to produce revised privilege logs within 10 days of the date of this Order.

## II

### A. Legal Standard Governing Dissolution of a Preliminary Injunction

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  We review an order regarding preliminary injunctive relief for abuse of discretion, but review any underlying issues of law de novo.  *Credit Suisse First Boston Corp. v. Grunwald*, 400 F.3d 1119, 1126 n.7 (9th Cir. 2005).

Pursuant to 28 U.S.C. § 1292(a)(1), we have jurisdiction to review an order "granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions." *See Gon v. First State Ins. Co.*, 871 F.2d 863,

865 (9th Cir. 1989). However, we have held "that a party that has failed to appeal from an injunction cannot regain its lost opportunity simply by making a motion to modify or dissolve the injunction, having the motion denied, and appealing the denial. In such a case, the appeal is limited to the propriety of the denial, and does not extend to the propriety of the original injunction itself." *Id.* at 866.

More specifically, we have held that in "reviewing denials of motions to dissolve injunctions, we do not consider the propriety of the underlying order, but limit our review to the new material presented with respect to the motion to dissolve." *Sharp v. Weston*, 233 F.3d 1166, 1169–70 (9th Cir. 2000). "A party seeking modification or dissolution of an injunction bears the burden of establishing that a significant change in facts or law warrants revision or dissolution of the injunction." *Id.* at 1170; *see also Alto v. Black*, 738 F.3d 1111, 1120 (9th Cir. 2013).

**B. We vacate the district court's striking of Defendants' motion to dissolve the preliminary injunction and remand for the district court to consider the merits of the motion**

Our inquiry under *Sharp* has two parts. We must first address whether the party seeking dissolution of the injunction has established "a significant change in facts or law." *Sharp*, 233 F.3d at 1170. If this showing has been made, the court must then address whether this change "warrants . . . dissolution of the injunction." *See id.* This latter inquiry should be guided by the same criteria that

govern the issuance of a preliminary injunction.[14]  In seeking dissolution of a preliminary injunction, however, the burden with respect to these criteria is on the party seeking dissolution.  *See Alto*, 738 F.3d at 1120.

## 1. Defendants have demonstrated a significant change in facts

Defendants have made the requisite threshold showing of a significant change in facts.  Plaintiffs assert that the 2018 Policy, like the 2017 Memorandum, broadly prohibits military service by transgender persons.  Beyond the narrow reliance exception, transgender individuals who wish to serve openly in their gender identity are altogether barred from service.  Even individuals who are willing to serve in the gender assigned to them at birth are barred from accession if they have a history or diagnosis of gender dysphoria, unless

---

[14]  Under those criteria:

> Plaintiffs seeking a preliminary injunction must establish that: (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest.  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  The Ninth Circuit weighs these factors on a sliding scale, such that where there are only "serious questions going to the merits" – that is, less than a "likelihood of success" on the merits – a preliminary injunction may still issue so long as "the balance of hardships tips *sharply* in the plaintiff's favor" and the other two factors are satisfied.  *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013).

*Short v. Brown*, 893 F.3d 671, 675 (9th Cir. 2018).

they can "demonstrate 36 consecutive months of stability –
i.e., absence of gender dysphoria – immediately preceding
their application." For service members who do not qualify
under the reliance exception, transition-related medical care
is also prohibited. Those who have undergone transition are
disqualified from service, and those who have not
transitioned are disqualified unless they suppress their gender
identity and serve in their birth-assigned sex. Plaintiffs
conclude that the new policy continues to broadly exclude
transgender persons from service in the military.[15]

But regardless of its overall effect, the 2018 Policy is
significantly different from the 2017 Memorandum in both its
creation and its specific provisions. Plaintiffs asserted that no
deference was due to the 2017 Memorandum because that
policy was not the product of military judgment – i.e. because
"President Trump did not rely upon the professional judgment
of military authorities *before* announcing the [policy]." The
2018 Policy, however, involved a study by a panel of military
experts that met 13 times over a period of 90 days, a 44-page
report issued by the Department of Defense, and a substantive
memorandum issued by Secretary Mattis. Moreover, there
are significant substantive differences between the 2017
Memorandum and the 2018 Policy. For example, the 2018
Policy includes a reliance exception for service members

---

[15] Defendants argue that the policy does not preclude service by *all*
transgender persons because there exists a subset of transgender persons
who do not have a history or diagnosis of gender dysphoria, do not wish
to transition, and do not wish to live or serve in their gender identity.
Even assuming that subset exists, the policy indisputably bars many
transgender persons from military service.

diagnosed with gender dysphoria after January 1, 2018 that the 2017 Policy lacked.

We hold that Defendants have made a sufficient showing of significant change to require the district court to address whether the change warrants dissolution of the preliminary injunction. We remand for the district court to perform this analysis.

### 2. Factors for the district court to consider in evaluating whether the significant change warrants dissolution of the preliminary injunction

Among the factors to be considered on remand are the level of constitutional scrutiny applicable to the equal protection or substantive due process rights of transgender persons and also the deference due to military decisionmaking. These two factors, although conceptually distinct, are here intertwined as we are asked to consider the propriety of a military decision concerning transgender persons. The district court concluded that the 2018 Policy had to satisfy "strict scrutiny if it is to survive." Our view is that existing law does not support the application of a strict scrutiny standard of review in this context.

In *United States v. Virginia*, 518 U.S. 515, 532–33 (1996), the Supreme Court held that for "cases of official classification based on gender . . . the reviewing court must determine whether the proffered justification is 'exceedingly persuasive.'" The justification "must be genuine, not hypothesized or invented *post hoc* in response to litigation," and "must not rely on overbroad generalizations about the different talents, capacities, or preferences of males and

females." *Id.* at 533. The Court further commented that
"[p]hysical differences between men and women, however,
are enduring," and that these differences should "remain
cause for celebration, but not for denigration of the members
of either sex or for artificial constraints on an individual's
opportunity." *Id.* Although the Supreme Court's opinion in
*Virginia* requires something more than rational basis review,
it does not require strict scrutiny.

We wrestled with defining the appropriate level of
judicial scrutiny of a military decision based on sexual
orientation in *Witt v. Department of the Air Force*, 527 F.3d
806 (9th Cir. 2008).[16] In reviewing the military's "Don't
Ask, Don't Tell" ("DADT") policy for gay and lesbian
service members, we adopted a three-factor test based on the
Supreme Court's opinion in *Sell v. United States*, 539 U.S.
166, 179-81 (2003). We held that:

> when the government attempts to intrude upon
> the personal and private lives of homosexuals,
> in a manner that implicates the rights
> identified in *Lawrence* [*v. Texas*, 539 U.S.
> 558 (2003)], the government must advance an
> important governmental interest, the intrusion
> must significantly further that interest, and the
> intrusion must be necessary to further that

---

[16] The Supreme Court in *Gilligan v. Morgan*, 413 U.S. 1, 10 (1973),
stated that "[t]he complex, subtle, and professional decisions as to the
composition, training, equipping, and control of a military force are
essentially professional military judgments." The Court further stated that
such decisions are "subject *always* to civilian control of the Legislative
and Executive Branches," and that courts should "give appropriate weight
to this separation of powers." *Id*. at 10–11.

> interest. In other words, for the third factor, a less intrusive means must be unlikely to achieve substantially the government's interest.

*Witt*, 527 F.3d at 819.

However, we held that this "heightened scrutiny" approach "is as-applied rather than facial." *Id.* We cited the Supreme Court's admonishment in *City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 447 (1985), that an as-applied approach "is the preferred course of adjudication since it enables courts to avoid making unnecessarily broad constitutional judgments." *Witt*, 527 F.3d at 819. We explained that we had to "determine not whether DADT has some hypothetical posthoc rationalization in general, but whether a justification exists for the application of the policy as applied to Major Witt." *Id.*

Here, in concluding that a strict scrutiny standard of review applied, the district court reasonably applied the factors ordinarily used to determine whether a classification affects a suspect or quasi-suspect class. *See Windsor v. United States*, 699 F.3d 169, 181 (2d Cir. 2012) (listing these factors), *aff'd on other grounds*, 570 U.S. 744 (2013).[17]

---

[17] These factors include:

> A) whether the class has been historically subjected to discrimination; B) whether the class has a defining characteristic that frequently bears a relation to ability to perform or contribute to society; C) whether the class exhibits obvious, immutable or distinguishing

Nonetheless, in light of the analysis in *Virginia* and *Witt*, the district court should apply a standard of review that is more than rational basis but less than strict scrutiny.

Defendants assert that, because this case involves judicial review of military decisionmaking, mere rational basis review applies. This contention, however, is foreclosed by our decision in *Witt*. *See Witt*, 527 F.3d at 821; *see also Rostker v. Goldberg*, 453 U.S. 57, 71 (1981) (explaining that the Court's decision in *Schlesinger v. Ballard*, 419 U.S. 498 (1975), "did not purport to apply a different equal protection test because of the military context, but did stress the deference due congressional choices among alternatives in exercising the congressional authority to raise and support armies and make rules for their governance"). Under *Witt*, deference informs the application of intermediate scrutiny, but it does not displace intermediate scrutiny and replace it with rational basis review.

Defendants alternatively argue that rational basis review applies because the classifications challenged here are based on "gender dysphoria" and "gender transition" rather than transgender status. This too is unpersuasive. On its face, the 2018 Policy regulates on the basis of transgender status. It states that "*Transgender persons* with a history or diagnosis of gender dysphoria are disqualified from military service,

---

characteristics that define them as a discrete group; and D) whether the class is a minority or politically powerless.

*Windsor*, 699 F.3d at 181 (citations, alteration, and internal quotation marks omitted).

except under [certain] limited circumstances," that "*Transgender persons* who require or have undergone gender transition are disqualified from military service," and that "*Transgender persons* without a history or diagnosis of gender dysphoria . . . may serve . . . in their biological sex." We conclude that the 2018 Policy on its face treats transgender persons differently than other persons, and consequently something more than rational basis but less than strict scrutiny applies.[18]

We also reject Plaintiffs' contention that no deference is owed here. Plaintiffs first argue that deference is not owed to the 2017 Memorandum because that policy was not the product of military judgment. Next, they argue that deference is not owed to the 2018 Policy because that policy simply implemented the 2017 Memorandum. According to Plaintiffs, the 2018 Policy "is not a new policy at all, but rather the expected and mandated outcome of President Trump's directives." As such, it could not have constituted a meaningful exercise of military judgment, because "whatever independent judgment the military brought to bear,

---

[18] Because the 2018 Policy discriminates on the basis of transgender status on its face, we need not address whether it constitutes discrimination against transgender persons on the alternative ground that gender dysphoria and transition are closely correlated with being transgender. *See Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of the Law v. Martinez*, 561 U.S. 661, 689 (2010) (citing *Lawrence*, 539 U.S. at 583 (O'Connor, J., concurring) ("While it is true that the law applies only to conduct, the conduct targeted by this law is conduct that is closely correlated with being homosexual. Under such circumstances, [the] law is targeted at more than conduct. It is instead directed toward gay persons as a class." (alteration in original))); *cf. Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 270 (1993).

it was limited to determining how to implement the [2017 Memorandum] – not whether to do so." Plaintiffs argue the deliberative process that led to the 2018 Policy was not an exercise of independent military judgment because the scope of this review was "constrained by President Trump's directives," the officials who conducted the review were not "free to disagree with President Trump," and the review's ultimate recommendations, having been "dictated" by the President, were "preordained."

Although Plaintiffs on remand may present additional evidence to support this theory, the current record does not bear out the contention that the 2018 Policy was nothing more than an implementation of the 2017 Memorandum, or that the review that produced the 2018 Policy was limited to this purpose. It is true that the 2017 Memorandum directed the Secretary of Defense to develop "a plan for implementing both the general policy . . . and the specific directives set forth in [that] memorandum." It is also true that Secretary Mattis subsequently created a panel to develop such a plan. But the 2017 Memorandum also provided that the Secretary of Defense "may advise [the President] at any time, in writing, that a change to this policy is warranted," and Secretary Mattis, accordingly, directed the panel not only to develop an implementation plan but also to "bring a comprehensive, holistic, and objective approach to study military service by transgender individuals." The panel, in turn, appears to have construed its mandate broadly.[19] The

---

[19] According to the Report:

   To fulfill its mandate, the Panel addressed three questions:

policies ultimately recommended by Secretary Mattis were somewhat different from the President's earlier policy and directives, and the President adopted the Secretary's recommendations.

In short, the district court must apply appropriate military deference to its evaluation of the 2018 Policy.  *See Witt*, 527 F.3d at 821.   On the current record, a presumption of deference is owed, because the 2018 Policy appears to have been the product of independent military judgment.   In applying intermediate scrutiny on remand, the district court may not substitute its "own evaluation of evidence for a reasonable evaluation" by the military.  *Rostker*, 453 U.S. at 68.  Of course, "deference does not mean abdication." *Witt*, 527 F.3d at 821 (quoting *Rostker*, 453 U.S. at 70). Defendants bear the burden of establishing that they reasonably determined the policy "significantly furthers" the government's important interests, and that is not a trivial burden.  *See id.*

Because the 2018 Policy is a significant change from the 2017 Memorandum, the district court on remand must apply the "traditional" standard for injunctive relief to determine whether dissolution of the injunction is warranted,

- Should the Department of Defense access transgender individuals?

- Should the Department allow transgender individuals to transition gender while serving, and if so, what treatment should be authorized?

- How should the Department address transgender individuals who are currently serving?

addressing: (1) whether Plaintiffs have made a sufficient showing of a likelihood of success on the merits; (2) whether Plaintiffs will be irreparably harmed absent interim relief; (3) whether the issuance of an injunction will substantially injure other parties; and (4) where the public interest lies. *Nken v. Holder*, 556 U.S. 418, 434 (2009); *Washington v. Trump*, 847 F.3d 1151, 1164 (9th Cir. 2017); *see also City & County of San Francisco v. Trump*, 897 F.3d 1225, 1243 (9th Cir. 2018).

## C. We extend the Supreme Court's stay of the preliminary injunction

On January 22, 2019, the Supreme Court issued an order staying the district court's preliminary injunction, pending Defendants' appeal in this court. As we vacate the district court's striking of Defendants' motion to dissolve the preliminary injunction and direct the district court to consider the motion on its merits, we now, consistent with the Supreme Court's order, stay the preliminary injunction through the district court's further consideration of the motion to dissolve.

## III

## A. Standard of Review Governing Mandamus Relief

Our consideration of Defendants' petition for a writ of mandamus is guided by the Supreme Court's opinion in *Cheney*, 542 U.S. 367. There, the Court held that three conditions must be satisfied before a writ may issue: (1) the petitioner must have no other adequate means to attain the relief desired; (2) the petitioner must show that the right to

the writ is clear and indisputable; and (3) "even if the first two prerequisites have been met, the issuing court, in the exercise of its discretion, must be satisfied that the writ is appropriate under the circumstances." *Id.* at 380–81. These conditions are consistent with the five guidelines we established in *Bauman v. U.S. District Court*, 557 F.2d 650, 654–55 (9th Cir. 1977), to determine whether mandamus is appropriate in a given case: (1) whether the petitioner has no other means, such as a direct appeal, to obtain the desired relief; (2) whether the petitioner will be damaged or prejudiced in any way not correctable on appeal; (3) whether the district court's order is clearly erroneous as a matter of law; (4) whether the district court's order is an oft repeated error or manifests a persistent disregard of the federal rules; and (5) whether the district court's order raises new and important problems or issues of first impression. *See In re Bundy*, 840 F.3d 1034, 1041 n.5 (9th Cir. 2016); *In re United States*, 791 F.3d 945, 955 n.7 (9th Cir. 2015).

### B. We vacate the district court's discovery order

The unique features of the executive privileges at issue in this litigation—the presidential communications privilege and the deliberative process privilege—suggest that there is no other adequate means of relief. The two privileges were explained in *Loving v. Department of Defense*, 550 F.3d 32 (D.C. Cir. 2008):

> The presidential communications privilege, a "presumptive privilege for [p]residential communications," *United States v. Nixon*, 418 U.S. 683, 708 (1974), preserves the President's ability to obtain candid and

> informed opinions from his advisors and to
> make decisions confidentially, *see Judicial
> Watch, Inc. v. Dep't of Justice*, 365 F.3d 1108,
> 1112 (D.C. Cir. 2004). As such, the privilege
> protects "communications directly involving
> and documents actually viewed by the
> President," as well as documents "solicited
> and received" by the President or his
> "immediate White House advisers [with] . . .
> broad and significant responsibility for
> investigating and formulating the advice to be
> given the President." *Id*. at 1114. The
> privilege covers documents reflecting
> "presidential decisionmaking and
> deliberations," regardless of whether the
> documents are predecisional or not, and it
> covers the documents in their entirety.[20]

*Id.* at 37–38 (alterations in original). Distinctly, the
deliberative process privilege:

> protects "documents reflecting advisory
> opinions, recommendations and deliberations
> comprising part of a process by which
> governmental decisions and policies are
> formulated." *Dep't of Interior v. Klamath
> Water Users Protective Ass'n*, 532 U.S. 1, 8
> (2001) (internal quotation marks omitted).
> For the deliberative process privilege to apply,
> the material must be "predecisional" and
> "deliberative." *In re Sealed Case*, 121 F.3d

---

[20] Here, and in future quotes, the parallel citations have been omitted.

> [729,] 737 [(D.C. Cir. 1997)]. Unlike the presidential communications privilege, the deliberative process privilege does not protect documents in their entirety; if the government can segregate and disclose non-privileged factual information within a document, it must. *Army Times Publ'g Co. v. Dep't of Air Force*, 998 F.2d 1067, 1071 (D.C. Cir. 1993).

*Id*. at 38.

Both forms of executive privilege are at issue in this litigation. The initial premise of the suit was that the President's Twitter Announcement and the 2017 Memorandum were not considered military decisions that warranted judicial deference. Although the focus has been shifted by the 2018 Policy, Plaintiffs raise non-frivolous arguments that the 2018 Policy did not independently analyze the impact of transgender individuals serving in the armed services, but rather implemented the 2017 Memorandum. Thus, the litigation may require the district court to consider the basis of the President's initial decision, as well as the 2018 Policy, and may implicate both the presidential communications and the deliberative process privileges.

## 1. The Presidential Communications Privilege

The district court gave insufficient weight to the Supreme Court's explanation in *Cheney*, that:

> [e]xecutive privilege is an extraordinary assertion of power "not to be lightly

> invoked." *United States v. Reynolds*, 345
> U.S. 1, 7 (1953). Once executive privilege is
> asserted, coequal branches of the
> Government are set on a collision course.
> The Judiciary is forced into the difficult task
> of balancing the need for information in a
> judicial proceeding and the Executive's
> Article II prerogatives. This inquiry places
> courts in the awkward position of evaluating
> the Executive's claims of confidentiality and
> autonomy, and pushes to the fore difficult
> questions of separation of powers and checks
> and balances. These "occasion[s] for
> constitutional confrontation between the two
> branches" should be avoided whenever
> possible. *United States v. Nixon*, [418 U.S.]
> at 692.

542 U.S. at 389–90 (second alteration in original).[21] The
Supreme Court explained that "*Nixon* does not leave [courts
with] the sole option of inviting the Executive Branch to
invoke executive privilege while remaining otherwise
powerless to modify a party's overly broad discovery
requests." *Id*. at 389. Rather, courts are urged to "explore

---

[21] The term "executive privilege" is sometimes used to refer to the
presidential communications privilege, *see, e.g., In re Lindsey*, 158 F.3d
1263, 1266–67 (D.C. Cir. 1998), and is sometimes "used to refer to a wide
variety of evidentiary and substantive privileges that courts accord the
executive branch," *In re Sealed Case*, 121 F.3d at 735 n.2. We use the
latter formulation, but *Cheney*, which involved discovery directed "to the
Vice President and other senior Government officials who served . . . to
give advice and make recommendations to the President," appeared to use
the former. 542 U.S. at 385.

other avenues, short of forcing the Executive to invoke privilege, when they are asked to enforce against the Executive Branch unnecessarily broad subpoenas." *Id*. at 390. The Supreme Court noted that the lower court had "labored under the mistaken assumption that the assertion of executive privilege is a necessary precondition to the Government's separation-of-powers objections." *Id*. at 391. Similarly here, the district court appears to have "labored under the mistaken assumption" that the President had to assert the presidential communications privilege to the specific documents covered by Plaintiffs' discovery requests before Defendants could lodge a separation-of-powers objection.

In its order, the district court focused on the deliberative process privilege and commented that Defendants "have failed to invoke the presidential communications privilege, to respond to a single discovery request, or to produce a privilege log identifying the documents, communications, and other materials they have withheld." But while Defendants' tactics in opposing discovery may have been unhelpful, they did not absolve the district court from "explor[ing] other avenues, short of forcing the Executive to invoke privilege." *Id*. at 390.

On remand, the district court should give due deference to the presidential communications privilege, but also recognize that it is not absolute. The D.C. Circuit in *In re Sealed Case* commented:

> A party seeking to overcome a claim of presidential privilege must demonstrate: first, that each discrete group of the subpoenaed

> materials likely contains important evidence; and second, that this evidence is not available with due diligence elsewhere. The first component, likelihood of containing important evidence, means that the evidence sought must be directly relevant to issues that are expected to be central to the trial. . . . The second component, unavailability, reflects *Nixon*'s insistence that privileged presidential communications should not be treated as just another source of information.

121 U.S. at 754–55.

Here, the district court stated it would apply this test after the President had invoked the privilege, which is consistent with how the test was applied in *In re Sealed Case*. *See id.* at 744 n.16. But, in light of the Supreme Court's subsequent opinion in *Cheney*, we hold that Plaintiffs must make a preliminary showing of need demonstrating "that the evidence sought [is] directly relevant to issues that are expected to be central to the trial" and "is not available with due diligence elsewhere." *Id.* at 754.

We note, however, that this standard does not require Plaintiffs to pinpoint with precision what materials they are seeking. *See Dellums v. Powell*, 561 F.2d 242, 248–49 (D.C. Cir. 1977) (holding plaintiffs overcame the presumption of the privilege despite not definitively establishing that conversations they sought actually took place); *United States v. Poindexter*, 727 F. Supp. 1501, 1510 (D.D.C. 1989) ("[The Court] will not place the defendant in the impossible position of having to provide exquisite specificity as a prerequisite to

enforcement of the subpoena by the Court, while he is denied access to the documents in question, thus making it impossible for him to be more specific."). So long as Plaintiffs' discovery requests are narrowly tailored to seek evidence that is directly relevant to central issues in the litigation and is not available with due diligence elsewhere, Plaintiffs have met their preliminary burden.

To the extent that Plaintiffs are able to meet this heightened standard, the President must be given the opportunity to invoke the privilege formally and make particularized objections to "show that the interest in secrecy or nondisclosure outweighs the need" for responsive materials, *Dellums v. Powell*, 642 F.2d 1351, 1363 (D.C. Cir. 1980), and the district court must conduct *in camera* review before any materials are turned over to Plaintiffs to excise non-relevant material and "ensure that presidential confidentiality is not unnecessarily breached," *In re Sealed Case*, 121 F.3d at 759; *see also Dellums*, 642 F.2d at 1364.

## 2. The Deliberative Process Privilege

The deliberative process privilege, although not as robust as the presidential communications privilege, still commands judicial consideration. We have held that "[a] litigant may obtain deliberative materials if his or her need for the materials and the need for accurate fact-finding override the government's interest in non-disclosure." *Warner*, 742 F.2d at 1161. As the district court here correctly recognized, we balance four factors in determining whether this exception to the deliberative process privilege is met: "1) the relevance of the evidence; 2) the availability of other evidence; 3) the government's role in the litigation; and 4) the extent to which

disclosure would hinder frank and independent discussion regarding contemplated policies and decisions." *Id*.

In balancing these factors, we note that the second and third criteria favor Plaintiffs. The evidence sought is primarily, if not exclusively, under Defendants' control, and the government—the Executive—is a party to and the focus of the litigation.

However, the existing record is not adequate to evaluate the relevance of all of the requested information, at least in terms of balancing production of materials against the military's countervailing confidentiality interest. For example, is information concerning the basis for the 2017 Memorandum still relevant now that the 2018 Policy has been adopted?[22] Although we do not mandate any particular course of action, the district court may wish to authorize discovery in stages when the current record is insufficient to establish relevance. Also, the fourth factor deserves careful consideration, because the military's interest in full and frank communication about policymaking raises serious—although not insurmountable—national defense interests. These are among the concerns that the district court and the parties should consider in balancing the deliberative process privilege with Plaintiffs' need for certain information.

---

[22] We note that in *Trump v. Hawaii*, 138 S. Ct. 2392, 2409 (2018), the Court held that "[t]he 12-page Proclamation—which thoroughly describes the process, agency evaluations, and recommendations underlying the President's chosen restrictions"—was sufficient to allow for judicial review.

Moreover, in balancing the *Warner* factors, the district court should consider classes of documents separately when appropriate. It is not clear the district court did so in this case. The district court appears to have conducted a single deliberative process privilege analysis covering all withheld documents, rather than considering whether the analysis should apply differently to certain categories. If Defendants persuasively argue that a more granular analysis would be proper, the district court should undertake it. Documents involving the most senior executive branch officials, for example, may require greater deference. (They may, of course, also be the most relevant.)

### 3. Conclusion

Although we hold that the district court did not adequately consider the weighty issues implicated by Plaintiffs' discovery requests, we appreciate that Defendants' responses to those requests may not have helped the district court in performing its difficult task. We express no opinion as to whether Defendants may be compelled to disclose any particular evidence to Plaintiffs or even to the district court for *in camera* review. We do expect, however, that the parties will provide the district court with the information and arguments it needs to balance the significant interests at play under the tests we have discussed above.

We issue the writ and vacate the district court's discovery orders because the district court did not fulfill its obligation "to explore other avenues, short of forcing the Executive to invoke privilege." *Cheney*, 542 U.S. at 390. In its further considerations of Plaintiffs' discovery requests, the district court should apply the standards set forth in *Cheney*, 542 U.S.

367, *In re Sealed Case*, 121 F.3d 729, *Warner*, 742 F.2d 1156, and the other cases discussed in this opinion.

## IV

We conclude that in striking the motion to dissolve the preliminary injunction, the district court failed to give the 2018 Policy the thorough consideration due. Regardless of the merits of the 2017 Memorandum, the reasonableness of the 2018 Policy must be evaluated on the record supporting that decision and with the appropriate deference due to a proffered military decision. Accordingly, we vacate the district court's striking of Defendants' motion to dissolve the preliminary injunction and remand the matter to the district court for reconsideration. Consistent with the Supreme Court's January 22, 2019 order, we stay the district court's December 11, 2017 preliminary injunction through the district court's reconsideration of Defendants' motion. If the district court denies the motion to dissolve the injunction, the stay shall remain in place throughout this court's disposition of any appeal by the Government.

We also issue the writ of mandamus and vacate the district court's discovery order, so that the district court may reconsider Plaintiffs' discovery requests giving full consideration to the Executive's Article II prerogatives. *See Cheney*, 542 U.S. at 389. The executive privileges—the presidential communications privilege and deliberative process privilege—although not absolute, require careful consideration by the judiciary, even when they have not been clearly or persuasively raised by the government. Furthermore, in *Cheney*, the Supreme Court rejected the notion that the Executive must first assert the presidential

communications privilege to narrow the subpoenas, and advised that it was "undesirable as a matter of constitutional and public policy to compel a President to make his decision on privilege with respect to a large array of documents." *Id.* at 390. The district court's future considerations of Plaintiffs' discovery requests should be guided by the Supreme Court's opinion in *Cheney*.

The district court's striking of Defendants' motion to dissolve the preliminary injunction is vacated, the preliminary injunction is stayed pending the district court's reconsideration of that motion, Defendants' petition for writ of mandamus is granted, the district court's July 27, 2018 discovery order is vacated, and this case is remanded to the district court.**[23]**

Following the Supreme Court's January 22, 2019 decision, Plaintiffs informed this court that they no longer oppose the remedy of vacatur of the preliminary injunction and remand sought by Defendants. Plaintiffs asked this court to "enter a summary order vacating the preliminary injunction and remanding to the district court for further proceedings." In response, Defendants urged us to "issue a reasoned decision vacating the district court's preliminary injunction." We have adopted neither of these paths. Our decision remands for the district court to consider the merits of Defendants' motion to dissolve the preliminary injunction.

---

**[23]** The parties and amici have raised a number of other issues which are arguably before us, but we decline to reach them in favor of further proceedings in the district court leading to the trial of Plaintiffs' contentions.

58                              KARNOSKI V. TRUMP

If Plaintiffs no longer wish to pursue a preliminary injunction, they may so advise the district court on remand.

18-35347 - The District Court's order striking motion to dismiss is

**VACATED** and **REMANDED.**

18-72159 - Writ **GRANTED** vacating District Court's discovery order and

**REMANDED.**

Each party shall bear its own costs of appeal.